Michael **HELPHENSTINE**, Appellant

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

No. 2012–SC–000251–TG.

Supreme Court of Kentucky.

Feb. 20, 2014.

Kathleen Kallaher Schmidt, Assistant Public Advocate, Molly Mattingly, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Heather Michelle Fryman, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

Michael Helphenstine entered a conditional guilty plea to one count of manufacturing methamphetamine, first offense, and being a second-degree Persistent Felony Offender (PFO 2). The trial court sentenced Helphenstine to fifty years' imprisonment. Helphenstine's charges stem from a search of his residence by his parole officers and local sheriff's deputies. As a matter of right,[1] Helphenstine seeks review of two issues: (1) the trial court's denial of a motion to suppress the products of the search of his home and (2) the trial court's denial of a motion to suppress the

---

1. Ky. Const. § 110(2)(b).

results of lab testing on the products of the search. Finding no error, we now affirm the judgment of conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Helphenstine's parole officers received an anonymous tip that he was using and manufacturing methamphetamine in the house he was renting. About a week later, the parole officers visited Helphenstine's house. Upon arrival, they met the landlord, who lived nearby. The landlord asked the parole officers to search Helphenstine's house because of suspicious activity and people around the house. The parole officers then made contact with Helphenstine at his house, at which time both Helphenstine and the landlord signed written forms consenting to a search of the property.

The search produced contraband associated with methamphetamine use and production, which prompted the parole officers to contact the local sheriff's office for assistance. Two sheriff's deputies arrived to aid with the search and handling of illegal substances. The search yielded such substances or devices as marijuana, Sudafed packs, syringes with residue, Coleman fuel, lithium batteries and lithium cores torn from batteries, and a one-step methamphetamine lab with methamphetamine oil inside. Helphenstine was arrested at the scene.

Helphenstine was indicted on one count of manufacturing methamphetamine, second or subsequent offense, and being a PFO 2. Before trial, Helphenstine filed a motion to suppress the products of the search on the grounds that (1) the parole officers did not have reasonable suspicion to search the premises and (2) the consent

form only gave consent to the parole officers but not the deputies. Helphenstine also filed a motion to suppress the results of lab testing [2] performed by the Kentucky State Police. The trial court held a suppression hearing where each party made legal arguments. Each side was then given time to submit briefs to support its argument. In the end, the trial court denied both of Helphenstine's motions.

Eventually, Helphenstine opted to enter a conditional guilty plea, reserving his right to appeal the two issues raised in his motions to suppress. Helphenstine pleaded guilty to a lesser offense, first-offense manufacturing methamphetamine, and to being a PFO 2. The Commonwealth recommended a sentence of fifty years' imprisonment, and the trial court sentenced Helphenstine accordingly. Helphenstine now appeals to this Court as a matter of right.

## II. ANALYSIS.

Helphenstine's two issues on appeal require us to address these three arguments he makes for reversal: The trial court erred by:

1) failing to hold an evidentiary hearing as required by Kentucky Rules of Criminal Procedure (RCr) 9.78;

2) denying the motion to suppress the products of the search of Helphenstine's residence; and

3) denying the motion to suppress the results of the Commonwealth's lab testing.

**A. Under his Plea Agreement, Helphenstine is not Entitled to Review of the Trial Court's Alleged Failure to Hold Evidentiary Hearing.**

█ Initially, we must address the Commonwealth's contention that review of Hel-

---

**2.** The motion was titled, "Motion [t]o Render Lab Results Inadmissible," but was treated as a motion to suppress.

phenstine's argument regarding the trial court's failure to hold an evidentiary hearing is unavailable. The Commonwealth argues this issue was not included as part of Helphenstine's conditional guilty plea and, as such, was not preserved for appeal. Admittedly, Helphenstine's conditional plea agreement preserves the following for appeal:

1) Motion to Render Laboratory Results Inadmissible Denied on 21 November 2011

2) Motion to Suppress Warrantless Search by Law Enforcement Denied on 21 November 2011

RCr 8.09 governs what may be preserved for appeal by a defendant in a conditional guilty plea. Under this rule, a defendant may "reserv[e] in writing the right, on appeal from the judgment, to review of the *adverse determination* of any specified trial or pretrial motion." [3]

Historically, we have limited review of conditional guilty pleas only to "claim[s] that the indictment did not charge an offense or the sentence imposed by the trial court was manifestly infirm" [4] or "issues ... expressly set forth in the conditional plea documents or a colloquy with the trial court[.]" [5] If the appellate issue is not specifically mentioned in the plea colloquy, we will still undertake review if the issue was "brought to the trial court's attention before the entry of the conditional guilty plea[.]" [6] And, as the Commonwealth's argument goes, Helphenstine (1) failed to bring to the attention of the trial court any potential error in not holding an evidentiary hearing and (2) the guilty plea documents contained no reference to this alleged error. As a result, the Commonwealth argues we should not entertain review or, at the very least, review should be under our palpable error standard. [7]

There is no dispute that Helphenstine initially preserved his right to appeal the trial court's rulings on the mentioned motions to suppress by entering a conditional guilty plea. But Helphenstine's appeal is not solely limited to the trial court's rulings on his pretrial motions. Instead, Helphenstine's appeal attacks the entire pretrial process by alleging the trial court erroneously failed to hold an evidentiary hearing as required by RCr 9.78. [8]

Here, not only did Helphenstine fail to bring to the trial court's attention any potential error associated with not holding an evidentiary hearing, he openly agreed to bypass an evidentiary hearing and only submit briefs detailing the legal arguments on the matter. At the suppression hearing, which Helphenstine now argues was not sufficient as an evidentiary hearing, the following exchange occurred:

**Judge:** Is there any reason to have a factual hearing?

**Commonwealth:** That's exactly what I'm getting at; I don't know if we need a factual hearing.

**Helphenstine's Counsel:** Well we can argue the law—

**Judge:** Do you want to stipulate the facts?

---

3. Emphasis added.

4. *Dickerson v. Commonwealth*, 278 S.W.3d 145, 149 (Ky.2009).

5. *Id.*

6. *Id.*

7. RCr 10.26.

8. RCr 9.78 is clear in its command for a trial court to hold an evidentiary hearing: "If at any time before a trial a defendant moves to suppress, ... the trial court *shall* conduct an evidentiary hearing[.]" (emphasis added). Indeed, we have held that the hearing is mandatory. *See, e.g., Mills v. Commonwealth*, 996 S.W.2d 473, 481 (Ky.1999).

**Helphenstine's Counsel:** That's fine with me, your Honor. The facts in the discovery that I was delivered is what I'm basing it on.

. . . .

**Judge:** OK, what do y'all want to do? You want to have an evidentiary hearing? You want to stipulate to the facts?

**Helphenstine's Counsel:** I can stipulate and [the Commonwealth's Attorney] can file his brief with some supporting law.

. . . .

**Helphenstine's Counsel:** No, [the Commonwealth's Attorney] agrees with my facts.

A similar conversation occurred regarding an evidentiary hearing for Helphenstine's motion to suppress the lab results:

**Helphenstine's Counsel:** The secondary issue is a motion I filed to declare the lab results inadmissible in this case. And I believe that that is still pertinent. . . . [T]he discovery has not changed at all. The lab result motion . . . just requires a ruling based on the discovery; we don't need any testimony on it. The issue is a legal one, and the court just needs to make a legal decision and a finding and a ruling.

Simply put, Helphenstine's argument regarding the trial court's failure to conduct an evidentiary hearing on his two suppression motions is outside the scope of his plea agreement and is not reviewable under RCr 8.09.[9] The trial court made no adverse determination on the issue of an evidentiary hearing. In fact, trial counsel assured the trial court "a factual hearing" was unnecessary and agreed to submit only the legal argument for the trial court's consideration. To the extent a determination was even made by the trial court, it certainly was not adverse. If anything, the decision to bypass an evidentiary hearing was urged upon the trial court by the contesting parties.

■ We are quick to note that our refusal to review Helphenstine's argument does not leave defendants without a remedy in similar circumstances where an evidentiary hearing is arguably waived and facts are stipulated. The parties, instead, must simply follow appropriate procedure. In this case, Helphenstine raises issues on appeal with the trial court's factual findings and alleges an evidentiary hearing would have aided in developing a more thorough record. Essentially, it appears Helphenstine is arguing the findings differed in a measurable degree from the facts that he stipulated. In such a situation, it is incumbent on the disaffected party to move the trial court for additional findings of fact and conclusions of law within ten days of the entry of the order under Kentucky Rules of Civil Procedure (CR) 52.02. An appellate court will not vacate a final judgment because of the failure of a trial court to make a finding of fact on an issue essential to the judgment "unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to [CR] 52.02."[10] Such civil rules are made applicable to criminal proceedings by RCr 13.04.[11] Any disagreement with the trial court's factual findings could have been remedied by filing a motion for further findings and then

---

9. *See, e.g., Lovett v. Commonwealth,* 103 S.W.3d 72, 84 (Ky.2003).

10. CR 52.04.

11. "The Rules of Civil Procedure shall be applicable in criminal proceedings to the extent not superseded by or inconsistent with these Rules of Criminal Procedure."

if adverse, preserving for appeal the trial court's ruling under RCr 8.09.

Finally, requiring a party to request further findings of fact in this situation is not "superseded by or inconsistent with"[12] RCr 9.78. We admit RCr 9.78 does not require the defendant affirmatively to request the trial court to make factual findings. But we do not read RCr 9.78 in a vacuum. In fact, courts have previously held that where a trial court fails to comply with RCr 9.78, a defendant waives appellate review by declining to request more detailed findings.[13] While best practice certainly does not call for allowing parties to agree to bypass the mandatory RCr 9.78 hearing, we find no error in this particular situation. And in future cases where the hearing is bypassed, by agreement or otherwise, parties should be on notice to challenge the facts at the proper point in the proceeding rather than raising novel arguments on appeal.

## B. The Denial of Helphenstine's Motion to Suppress the Products of the Search was not in Error.

Helphenstine next argues that the trial court erred in denying his motion to suppress the products of the warrantless search of his residence.[14] The crux of Helphenstine's argument is that as a parolee, he consented to a home visit by his parole officers but did not consent to a search by the two deputies. And Helphenstine argues that the parole officers did not have reasonable suspicion to search the residence as a condition of his parole. Finding Helphenstine's argument rejected by our case law, we disagree.

As a general rule, warrantless searches are, per se, unreasonable, "subject only to a few specifically established and well-delineated exceptions."[15] Of course, Helphenstine still enjoys Fourth Amendment protection; but his status as a parolee diminishes his expectation of privacy.[16] A parolee is not granted "complete freedom."[17] The Commonwealth "may issue regulations allowing a probation or parole officer to search a probationer's or parolee's property without a warrant."[18] But such warrantless searches must satisfy the Fourth Amendment's overarching reasonableness requirement. To this end, a warrantless search is held to be reasonable "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity."[19] Finally, "[c]onsent is one of the exceptions to the requirement for a warrant"[20] but consent must "not be

**12.** RCr 13.04.

**13.** *See, e.g., Farmer v. Commonwealth,* 169 S.W.3d 50, 53 (Ky.App.2005).

**14.** Our standard of review of a trial court ruling on a motion to suppress is two-pronged. First, we review the trial court's findings of fact. If they are supported by substantial evidence, they are conclusive. Here, the facts were stipulated to by both parties; and we find them supported by substantial evidence. Second, we conduct a de novo review of the trial court's application of the law to the facts to determine if the decision was correct as a matter of law. *See Jackson v. Commonwealth,* 187 S.W.3d 300 (Ky.2006).

**15.** *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**16.** *Riley v. Commonwealth,* 120 S.W.3d 622, 626–27 (Ky.2003).

**17.** *Wilson v. Commonwealth,* 998 S.W.2d 473, 475 (Ky.1999).

**18.** *Riley,* 120 S.W.3d at 627.

**19.** *United States v. Knights,* 534 U.S. 112, 122, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).

**20.** *Cook v. Commonwealth,* 826 S.W.2d 329, 331 (Ky.1992) (citing *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)).

coerced, by explicit or implicit means[.]"[21]

■ Helphenstine spends a good portion of his brief arguing the absence of reasonable suspicion, but we find the search conducted by law enforcement officials of Helphenstine's residence to be reasonable because consent was given. So we see no reason to rely on reasonable suspicion.[22] First, it is important to point out that the law enforcement officials had a legal right to be at Helphenstine's residence and engage Helphenstine with or without the information provided in the anonymous tip letter. As a condition of his parole, Helphenstine was required to sign a document outlining the various restrictions on his freedom. Such restrictions included: "[y]ou shall permit your parole officer to visit your home and place of employment *at any time.*"[23] Undoubtedly, the parole officers were within their authority to visit Helphenstine's residence and speak with him.[24]

■ Upon arriving at the property and speaking with the landlord and Helphenstine, the parole officers obtained consent to search the premises. Helphenstine and the landlord gave their consent in written form, signing a document produced by the parole officers. The document provided that Helphenstine and the landlord gave their consent "for such property to be searched by Officers of the Kentucky Corrections Department, Community Services and Facilities and *such other officers as may assist them.*"[25] There is no evidence to indicate the consent was coerced, either explicitly or implicitly, outside of the routine inherent coercion associated with the nature of a parolee's relationship with his parole officer.

Helphenstine argues that his consent only applied to the parole officers but did not apply to the sheriff's deputies who were called in following the discovery of illegal substances. We find this argument meritless. And, furthermore, our case law rejects this attempted "stalking horse"[26] argument. The consent form clearly provides consent to "such other officers as may assist [the parole officers]." There is no indication that "such other officers" is

---

21. *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "The general prohibition against warrantless entry into the home may be overcome by any valid exception to the warrant requirement, such as consent." *Sublett v. Commonwealth,* 203 S.W.3d 701, 705 (Ky.2006).

22. For the sake of thoroughness, we note that an anonymous tip or letter is not enough to qualify as reasonable suspicion. The anonymous tip must be corroborated before reasonable suspicion may arise. In this case, the law enforcement officers received corroborating information of suspicious activity from the landlord upon arriving at Helphenstine's residence. Although probable cause is lacking, it is important to remember that reasonable suspicion is a much lower bar—a bar low enough to be satisfied by the circumstances presented here. Moreover, the United States Supreme Court has held that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprison-

ment[.]" *Samson v. California,* 547 U.S. 843, 850, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). As such, parolees have no "expectation of privacy that society would recognize as legitimate"; and searches completely devoid of suspicion are allowable. *Id.* at 852, 126 S.Ct. 2193. We have, to this point, not recognized a distinction between probationers and parolees with regard to search requirements.

23. Emphasis added.

24. This would be the case even if Helphenstine were not a parolee under active supervision. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

25. Emphasis added.

26. This phrase is commonly used to describe a situation where the police, arguably unlawfully, gain entrance to a residence through the use of parole officers.

limited to only other parole officers. Certainly, the deputy sheriff and the detective here would qualify as "such other officers." And the trial court's findings of fact—stipulated to by Helphenstine—indicate that the law enforcement officers were called in to aid the parole officers with collecting and disposing of the illegal substances found at Helphenstine's residence. Proper handling of a volatile methamphetamine manufacturing site may likely be beyond the scope of a parole officer's training. It seems entirely reasonable to request help from law enforcement officers more versed in this area. The consent form signed by both Helphenstine and his landlord allows parole officers to do just that.

In *Riley v. Commonwealth*, the Court dismissed Helphenstine's alternative argument. Underlying Helphenstine's challenge to the validity of his consent is the notion that the parole officers only showed up to Helphenstine's residence as a subterfuge to allow law enforcement officers access. Essentially, according to Helphenstine, he consented to a visit for parole purposes but not for potential criminal prosecution. In *United States v. Knights,* the Supreme Court held that there was no basis for examining official purpose, essentially eviscerating the "stalking horse" defense. We acknowledged this in *Riley.* There is no need to "engage in a subjective examination of the official purpose behind this particular . . . visit." [27]

Helphenstine consented to the search of his residence. The consent was valid and there is no indication of any circumstance casting on it a shadow of impropriety. The consent form is unambiguous, and we find it gave both the parole and the law enforcement officers the authority to enter the residence. The trial court properly denied Helphenstine's motion to suppress the products of the search.

## C. The Trial Court did not Err in Denying Helphenstine's Motion to Suppress the Lab Results.

Finally, Helphenstine challenges the chain of custody of the evidence collected during the search and later tested by KSP. Helphenstine argues that photographs must be taken of the site where drugs are collected and, in this case, none were produced by the Commonwealth in discovery. And Helphenstine argues that the Commonwealth destroyed the products of the search during testing to such an extent that he was prevented from having them alternatively tested.[28] According to Helphenstine, the effect of these errors violated his right to due process. We disagree.

In our evidentiary rules and jurisprudence, it is a ubiquitous principle that all relevant evidence is admissible.[29] But, of course, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury[.]" [30] For evidence in the vein of lab results to be admitted, it must be authenticated to a degree "sufficient to support a finding that the matter in question is what its proponent claims." [31] At

---

27. *Riley,* 120 S.W.3d at 628.

28. We will not engage in a long discussion of this issue. At the pretrial hearing, the Commonwealth stated there was enough evidence left to be tested by Helphenstine. But Helphenstine filed no motion or request with the trial court for the remaining substance to be turned over for independent testing.

29. Kentucky Rules of Evidence (KRE) 402.

30. KRE 403.

31. KRE 901(a).

bottom, Helphenstine's argument seems to be that the Commonwealth has not adequately shown the evidence tested and detailed in the lab results is what the Commonwealth purports it to be. We can find no case law to indicate that police are required to take pictures of a crime scene in order to authenticate evidence taken from that crime scene. Given the volatile nature of methamphetamine laboratories, the failure to photograph the crime scene, while seemingly not the best practice, is understandable. Regardless, the lab results are unquestionably admissible because of their highly probative nature outweighing the routine amount of prejudice associated with potentially inculpatory evidence.

 Following the search of Helphenstine's residence, the law enforcement officers filled out various reports detailing the evidence recovered. Admittedly, there is a dearth of information documenting where the evidence was located 01 how it was collected or tested. The chain of custody arguably appears imperfect. But "it is unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification, so long as there is persuasive evidence that 'the rea-sonable probability is that the evidence has not been altered in any material respect.'"[32] Even if we assume there are gaps or problems in the chain of custody, their presence "normally go[es] to the weight of the evidence rather than its admissibility."[33]

The Commonwealth has not completely abdicated its responsibility to prove a proper chain of custody in this case. Instead, the Commonwealth averred that proper chain of custody would be presented at trial with the testimony of the KSP lab technician and officer who collected and delivered the evidence.[34] If the chain of custody were fatally flawed at that point, the trial court would have adequate remedies at its disposal to protect Helphenstine's rights. But Helphenstine, with the aid of counsel, made a voluntary, strategic decision to forego trial and enter a conditional plea of guilty. Consequently, the Commonwealth was not put to the task of proving the chain of custody as promised. Helphenstine's decision to enter a conditional guilty plea does not weigh on the admissibility of the lab results in question.[35]

Helphenstine takes umbrage with some of the trial court's factual findings; but, as

---

**32.** *Rabovsky v. Commonwealth*, 973 S.W.2d 6, 8 (Ky.1998) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1532 (10th Cir.1989)).

**33.** *Rabovsky*, 973 S.W.2d at 8.

**34.** The Commonwealth stated in its reply to Helphenstine's motion that the testimony authenticating the evidence would include: (1) how the evidence was collected, sealed, and delivered to the KSP lab; (2) the KSP lab returned the evidence with a new evidence seal; (3) authentication through the police evidence logs and evidence tape; (4) the evidence was received by the KSP lab sealed, and the technician opened and tested the evidence before appropriately resealing it; and (5) the actual sealed evidence would be displayed in court.

**35.** Inherently, a guilty plea precludes prosecution from presenting the case before a jury at trial. A defendant's decision to enter a guilty plea, whether it be for strategic or other reasons, does not allow him later to challenge the admissibility of evidence simply because the proof intended for trial was never offered for introduction. Furthermore, in this particular case, the evidence was not proffered by the Commonwealth at the request, or at least concurrence, of defense counsel. Again, this scenario approaches invited error because it appears to be the proverbial "buried land mine[]" placed in the record primed to explode on appeal and threaten an otherwise sound conviction. *See LaFleur v. Shoney's, Inc.*, 83 S.W.3d 474, 481 (Ky.2002) (Lambert, C.J., dissenting).

we detailed earlier in this case, appellate review under RCr 8.09 is not the appropriate vehicle to challenge the trial court's factual findings. Furthermore, the trial court's findings are based on substantial evidence from the record.[36] Because the lab results were clearly admissible, the trial court was not in error.

## III. CONCLUSION.

For the reasons set forth above, we affirm Helphenstine's conviction and sentence.

All sitting. All concur.

---

**36.** In particular, Helphenstine takes issue with the trial court finding, "[t]he evidence was marked, packaged, and sealed. [The police officer] delivered the evidence to the Kentucky State Police lab, where it was analyzed. [The police officer] picked up the sealed materials from the lab and delivered them to the evidence room at the Sheriff's office on January 10, 2011." But a close reading of the discovery supports the trial court's finding. In the Commonwealth's reply to Helphenstine's motion to suppress the products of the search, we find: "The evidence collected was identified on an Evidence/Recovered Property Log (Kentucky State Police Form 41) and was appropriately *marked, packaged, and sealed.*" (emphasis added). The materials were sealed when the officer picked them up from the KSP lab as detailed by the Commonwealth in its reply to Helphenstine's motion to suppress the lab results: "[the KSP lab technician] received the *sealed* evidence, opened and tested the evidence, and then, *after appropriately sealing it,* returned the evidence." (emphasis added). Before this appeal, Helphenstine did not challenge any of these assertions.